2012 Ark. App. 133

**OZARK NATURAL FOOD and Nationwide Mutual Insurance Co., Appellants**

v.

**Leah PIERSON, Appellee.**

**No. CA 11–939.**

Court of Appeals of Arkansas.

Feb. 8, 2012.

Randy Phillip Murphy, Little Rock, for appellant.

Mark J. Freeman, Little Rock, for appellee.

CLIFF HOOFMAN, Judge.

Appellants Ozark Natural Food and Nationwide Mutual Insurance Company appeal from the Arkansas Workers' Compensation Commission's (Commission) decision, affirming and adopting the findings of the Administrative Law Judge (ALJ), that appellee Leah Pierson sustained a compensable aggravation of her preexisting cervical spine problems as a result of her work injury and that she is entitled to reasonably necessary medical treatment related to this injury. On appeal, appellants argue that the Commission's decision is not supported by substantial evidence. We affirm.

Pierson, who was forty years old at the time of her injury, was employed by Ozark Natural Food on October 8, 2007, when she was involved in an incident at work. According to Pierson's testimony, she was walking toward the swinging doors in the back of the store and had placed her right palm on the door, when another employee came from the other side of the doors with a cart and slammed the doors open with a tremendous amount of force, knocking her backward and causing her pain in her right arm and shoulder, as well as her neck and back. Because it was in the evening when the incident occurred, Pierson sought medical treatment the next day at the MediServe walk-in clinic. The notes from her October 9, 2007 visit indicate that Pierson described the work incident from the day before and complained of pain in her right wrist, right shoulder, neck, and back. She was diagnosed with a right-shoulder hyperextension injury, prescribed pain medication, and placed on work restrictions. She continued to receive follow-up care with the clinic, and the medical report from October 30, 2007, states that Pierson's right-shoulder pain was improving, although her neck pain and range of motion were worse.

Pierson was examined by Dr. Robert Tomlinson, Jr., an orthopedic physician, on February 1, 2008. Dr. Tomlinson stated that Pierson had been experiencing right-shoulder pain since the door incident and that she specifically complained of parascapular pain on the right side and at the base of her neck. The report noted that Pierson had a history of thoracic scoliosis in the T6 area and slight dextroscoliosis in the right scapulothoracic region. Dr. Tomlinson stated that cervical x-rays showed "moderate disc narrowing at C6–7," and his impression was "scapulothoracic myofascial syndrome, thoracic scoliosis, and cervical spondylosis without radiculo-

pathy." He released Pierson to return to work with lifting restrictions for her right arm and recommended physical therapy.

After several weeks of physical therapy, Dr. Tomlinson noted that Pierson had improved, and he recommended additional sessions. The progress note from March 5, 2008, indicates that Pierson had "palpable knots and spasms" to her left-upper trapezius muscle, left-posterior$_3$ cervical musculature, and levator muscles, and that she was most tender directly around the C5–7 vertebra. The progress note further states that additional exercises to address Pierson's tightness, spasms, and discomfort in her neck were introduced. Although the progress notes indicate that Pierson initially improved during her physical therapy, Dr. Tomlinson's report from a follow-up visit on March 28, 2008, stated that after eighteen therapy sessions, her symptoms had only slightly improved overall and that she felt she had made "a turn for the worse." He recommended that Pierson undergo a "disc regenerative program" or that she see a spine specialist.

Pierson was referred to Dr. Joel Sebag for further physical therapy in April 2008, and Dr. Sebag's initial evaluation stated that Pierson complained of worsening neck pain and muscle cramping from her injury at work, which interfered with her sleep and caused her pain when turning her neck. After completing the physical therapy, Pierson returned to Dr. Tomlinson on April 28, 2008, and this report stated that she reported a history of neck problems off and on for the last thirteen years. Although Dr. Tomlinson noted that Pierson was initially seen for "scapular thoracic myofascial syndrome," he felt that some of her symptoms were related to her cervical spine. He indicated that Pierson had improved by 75% following her most recent course of physical therapy, and he recommended further therapy for her per-

iscapular region and her neck, as well as a referral to a spine specialist for evaluation and treatment of her cervical spine. Dr. Tomlinson also stated that Pierson had no impairment rating for her right-shoulder injury and that she was able to return to work without restrictions. After further questioning by the workers' compensation insurance $|_4$carrier, Dr. Tomlinson indicated that Pierson's current neck complaints preexisted her work injury sustained on October 8, 2007.

Pierson underwent an MRI on June 5, 2008, pursuant to appellants' request for an independent medical evaluation by Dr. James Blankenship, a neurosurgeon. Dr. Blankenship's impressions from this procedure were "C5–6 significant spondylosis and degeneration with marked rotatory kyphoscoliosis" and a "small C7–T1 disk protrusion without significant neural impingement."

In his medical report dated June 10, 2008, Dr. Blankenship described the incident at work where Pierson was injured on October 8, 2007, and noted that she had suffered an acute onset of right hand and shoulder pain, which had significantly diminished since that time. He stated that Pierson developed bilateral neck pain after the incident, as well as headaches and TMJ syndrome in her jaw. According to Dr. Blankenship's report, Pierson "readily admitted that she has had problems with her neck and lower back over the years" and that she was diagnosed with scoliosis at a young age; however, she was doing very well prior to her work injury and was not experiencing any significant problems. Also, Dr. Blankenship stated that Pierson's medical records did not indicate any ongoing problems or active treatment for pain prior to her accident at work. After examining Pierson, Dr. Blankenship noted a significant degree of spondylosis in her neck for her age and

stated that this degree of degeneration was likely affecting her current physical complaints. He further stated, however, that he felt her current complaints of pain and need for treatment were still directly related to her injury. When asked about the relationship between her neck pain and the incident at work, Dr. Blankenship stated that "it is not at all uncommon for patients to have significant myfascial injuries with this type of shoulder pathology and likely a mild flexion extension injury to her neck," and that it would also not be uncommon for this to be delayed in nature. He stated that he did not feel as though Pierson's degenerative process in her spine was the "primary etiology of her current pain complaints." Although he did not feel that surgical correction was necessary at that point in time, he stated that Pierson was not at maximum medical improvement (MMI) and that he would recommend additional active, exercise-oriented physical therapy.

The medical reports from follow-up visits with Dr. Blankenship in July and September 2008 indicated that Pierson continued to work at Ozark Natural Food, although her complaints of pain in her neck and jaw were increasing and she was also complaining of bilateral hip pain. He made a referral for Pierson's jaw problems and again placed work restrictions on her, noting that her pain was worse at the end of the day after she had been standing on concrete floors. At a follow-up visit in November 2008, Dr. Blankenship's report noted that Pierson had recently suffered from serious medical issues unrelated to her work injuries, that she had been unable to complete her physical therapy due to these issues, and that she was still suffering from persistent neck and lower back pain. Another follow-up appointment was scheduled for January 8, 2009. Dr. Blankenship stated that Pierson had continued with her physical therapy and that her neck pain was improving.

After Pierson's improvement proved to be transient, she obtained a second MRI on July 24, 2009. The MRI report from Dr. Blankenship noted a "soft lateral disc herniation" at the C6–7 level on the left side, resulting in "significant narrowing of the neural exit foramen on the left," as well as "multilevel spondylosis with kyphosis, most significant at C6–7, but also present at C5–6 and C7–T1." His medical report from October 8, 2009, stated that Pierson had undergone an injection but only received temporary relief. Dr. Blankenship stated that conservative measures had failed to resolve Pierson's symptoms, and he offered her the option of surgery on her spine at the C5–6 and C6–7 levels. The report indicated that Pierson wanted to try another injection, but if that failed to provide relief, then she wished to proceed with surgery. Dr. Blankenship clarified, at the request of the case manager, that it was his opinion, "based on a reasonable degree of medical certainty that her injury that she had at work led to the disk herniation and subsequently created the kyphosis and the mechanical neck pain." He further stated that "her current problems are 100 percent related to her on-the-job injury, which is when the disk herniation occurred, which led to the annular disruption both at C6–7 and to a lesser extent C5–6."

Appellants requested that Dr. Earl Peeples review Pierson's medical reports to offer another opinion as to whether her current symptoms were related to her work incident on October 8, 2007. According to Dr. Peeples's October 14, 2009 report, Pierson's work-related injury was limited to her right upper extremity, which had since resolved, and he felt that Dr. Tomlinson's release should have terminated the medical care related to this work

incident. He opined that Pierson's additional complaints of pain in her jaw, neck, and hips were not causally related to the October 8, 2007 incident and that these symptoms could best be explained by a forensic, psychological, or secondary gain basis.

Appellants subsequently deposed Dr. Blankenship on January 12, 2010, and this deposition was introduced into evidence at the December 2010 hearing before the ALJ. He was questioned about the herniated disc found on Pierson's second, 2009 cervical MRI, as this herniation, which Dr. Blankenship had related to the work incident, was not indicated in his impressions from Pierson's initial MRI in 2008. Dr. Blankenship stated in his deposition that, without reexamining the two MRI reports, he was unsure as to why he had not noticed the herniation at the C6–7 level in the initial MRI, although he indicated that it could have been present but not visible on the 2008 MRI due to the rotation of Pierson's spine at that level. When asked about his basis for recommending the spine surgery, Dr. Blankenship stated that the surgery was elective but that Pierson had failed conservative treatment for her neck pain and that he felt the C6–7 herniation was causing the majority of her pain symptoms.

After Dr. Blankenship's deposition, he compared Pierson's two cervical MRIs and wrote an additional report on January 21, 2010. In this report, Dr. Blankenship explained that the two MRIs were taken at different facilities, using different magnets. He stated that the second scan was of better quality, but that after again reviewing the first MRI, he did in fact see a disc protrusion at C6–7 on the left side. He opined within a reasonable degree of medical certainty that the two MRIs showed essentially the same findings, when taking into account the differences in magnets and quality. On February 15, 2010, Dr. Peeples wrote a second report responding to Dr. Blankenship's deposition and addendum letter and disagreeing with his opinion as to causation and his recommendation of surgery. In a subsequent letter response, Dr. Blankenship noted that Dr. Peeples was an orthopedic surgeon who had no specific expertise relating to the spine.

In addition to Dr. Blankenship's deposition, the medical reports, and Pierson's testimony that her neck and jaw symptoms were still causing her a great deal of discomfort, testimony from an acquaintance and former co-worker of Pierson's, Dusty Lee, was also introduced at the hearing. Lee testified that he had known Pierson for five years and worked with her for two years at Ozark Natural Food, but that he could not recall her having any jaw or neck complaints during that time.

Following the hearing, the ALJ found that Pierson had failed to prove by a preponderance of the evidence that she had suffered a compensable jaw injury in the form of TMJ as a result of her October 2007 work injury; that she had proved by a preponderance of the evidence that she suffered a compensable aggravation to her preexisting cervical difficulties as a result of her October 2007 work injury; that she was entitled to reasonable and necessary medical treatment for her cervical aggravation; and that she had failed to prove entitlement to additional temporary-total-disability (TTD) benefits from May 5, 2010, to September 21, 2010. The Commission, in a 2–to–1 decision, affirmed and adopted the ALJ's findings. Appellants now appeal from the Commission's decision. Pierson has not cross-appealed the Commission's decision denying her additional TTD benefits and treatment for her jaw injury; therefore, the only issue on appeal is whether substantial evidence supports

the Commission's finding as to the compensability of her neck injury.

When reviewing a decision of the Workers' Compensation Commission, the Court of Appeals views the evidence and all reasonable inferences deducible therefrom in the light most favorable to the findings of the Commission. *Evans v. Bemis Co., Inc.,* 2010 Ark. App. 65, 374 S.W.3d 51. This court must affirm the decision of the Commission if it is supported by substantial evidence. *Id.* Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion of the Commission. *Id.* We only reverse the Commission's decision if we are convinced that fair-minded persons could not have reached the same conclusion with the same facts before them. *Id.* Questions regarding the credibility of witnesses and the weight to be given to their testimony are within the exclusive province of the Commission. *Id.* When the Commission, as it did in this case, affirms and adopts the ALJ's findings, this court considers both the ALJ's decision and the Commission's opinion. *Montgomery v. J & J Lumber Co.,* 2011 Ark. App. 129, 2011 WL 542666.

Because an employer takes an employee as he finds him, employment circumstances that aggravate preexisting conditions are compensable. *Grothaus v. Vista Health, LLC,* 2011 Ark. App. 130, 382 S.W.3d 1. Thus, an aggravation of a preexisting non-compensable condition by a compensable injury itself is compensable; however, the aggravation, being a new injury with an independent cause, must meet all of the requirements for a compensable injury. *Id.* A compensable injury must be established by medical evidence supported by objective findings. Ark.Code Ann. § 11–9–102(4)(D) (Supp.2009). "Objective findings" are those findings that cannot come under the voluntary control of the patient; thus, complaints of pain or tenderness do not constitute objective findings. Ark.Code Ann. § 11–9–102(16).

Appellants argue that Pierson failed to prove that her neck symptoms were a compensable aggravation of her preexisting cervical problems because there was no medical evidence supported by objective findings of a new compensable injury or aggravation; rather, there were only her subjective complaints of pain and the medical evidence of her preexisting degenerative disease. In making this argument, appellants discount the findings of a herniated disc at the C6–7 level, noting that the MRIs were not taken until more than one-and-a-half years after the work-related incident. Thus, appellants contend that there is no objective support for a causal connection between the herniation and the work incident.

Contrary to appellants' argument, objective medical evidence is not essential to establish a causal relationship between the injury and the work-related accident in every case, as long as the claimant presents supplemental evidence supporting the causal connection. *Freeman v. Con–Agra Frozen Foods,* 344 Ark. 296, 40 S.W.3d 760 (2001); *Heptinstall v. Asplundh Tree Expert Co.,* 84 Ark.App. 215, 137 S.W.3d 421 (2003). Where the claimant does rely on medical evidence to establish causation, however, such medical evidence must satisfy the statutory requirement under Ark. Code Ann. § 11–9–102(16)(B) (Supp.2009), that medical opinions be stated within a reasonable degree of medical certainty. *Freeman, supra.*

In finding that Pierson proved by a preponderance of the evidence that she did sustain a compensable aggravation of her preexisting cervical issues, the ALJ noted that Pierson complained of pain in her neck when she first sought medical treat-

ment the day after her accident and that she continued to make these complaints throughout the time period that she underwent her MRIs and treatment with Dr. Blankenship. The ALJ also found that the reports from these two MRIs constituted objective medical findings. The ALJ further noted that Pierson certainly had cervical problems that predated her work injury but found that, given the nature of the injury itself and the medical evidence, Pierson's work-related injury did aggravate her preexisting problems and that the medical treatment that she was seeking was reasonable and necessary treatment for this compensable aggravation. While Drs. Tomlinson and Peeples opined that Pierson's neck complaints were not causally related to her work-related incident, the ALJ instead chose to credit Dr. Blankenship's opinion on the existence of a causal relationship, which was rendered with the required reasonable-degree-of-medical-certainty standard. The ALJ specifically stated that Dr. Peeples's opinion was not given as much weight because he never examined Pierson and did not have spinal expertise.

It is within the Commission's province to weigh conflicting medical opinions and evidence, and when the Commission chooses to accept the opinion of one physician over that of another, the appellate court is powerless to reverse the decision. *Hernandez v. Wal–Mart Associates, Inc.*, 2009 Ark. App. 531, 337 S.W.3d 531. Thus, there was substantial evidence to support the Commission's decision that Pierson proved that she suffered a compensable aggravation of her preexisting cervical problems, and we affirm.

Affirmed.

VAUGHT, C.J., and ABRAMSON, J., agree.